The next case we'll hear is United States v. McIntosh, 23-1899. Good morning, Your Honors. May it please the Court, Mary Kay Healy on behalf of Appellant Mr. Nassim McIntosh. I'd like to reserve four minutes for rebuttal. Thank you. This case involves two challenges to the sentencing guidelines under Kaiser. I'd like to start with the first, the enhanced base offense level for a semi-automatic firearm that is capable of accepting a large capacity magazine. The parties agree that that term is genuinely ambiguous. However, the commentary's interpretation of it in Application Note 2 is not reasonable for three reasons. First, it unreasonably retains parity between assault weapons that had previously been banned under the Assault Weapons Ban of 1994 and firearms regulated under the National Firearms Act and, in fact, expands the class of weapons that are subject to the enhanced base offense level. Second, it is an arbitrary policy choice. It's not a reasonable interpretation of large capacity magazine. And third, it expands the text in a way that swallows the rule. Why is it genuinely ambiguous under Kaiser Step 1, just so I understand your point? I know the parties can see this, but Kaiser is a rigorous test that uses all of the tools in the traditional toolbox. Why, using that, is this still genuinely ambiguous? I think it is genuinely ambiguous, the parties agree, because it is subject to at least two meanings. We propose that it requires a comparison between a, we say that large, you know, it means exceeding most other things of like kind, especially in quantity or size, dealing in great numbers or quantities, having more than usual capacity or scope. Our position is that requires some sort of relative comparison, and that how you make that comparative, that relative comparison, could be ambiguous. Why is that ambiguous? Why can't we figure out what the standard capacity magazine is in 2006? Is that an unknowable fact? It's not an unknowable fact, but it perhaps depends on the firearm, on the type of firearm and the make and model. So certainly that's the approach we're advocating, that you would make a determination about what is large capacity magazine at the second step when you're figuring out what is a reasonable definition of that term. But I think it's step one. I want to go back to this, because if you're saying, well, it's possible to know that, I understand the district court didn't do that, but if it's possible that through an application of text, context, purpose, you could say, taking your example, well, large means abnormal capacity or not standard capacity. Here's what standard or normal capacity for this firearm was in 2006. We know whether this is large or standard. Doesn't that answer the, couldn't that answer the interpretive question? I think it could answer the interpretive question, but I don't think it could answer it. I mean, I don't know that we can, can we just gloss by step one and say, look, Kaiser makes the point of saying just because the interpretive process is hard, doesn't mean that we can ignore it. So if we can work through that and the district court didn't work through that, is that something that's a problem? I'm sorry, the second, if we can work through that and the district court did or did not work through that. Didn't work through that. And I understand that everyone says, well, it's genuinely ambiguous because it's subject to, it's hard to know, but that's not enough under Kaiser, is it? Thank you. I take your point that on this record, the parties did largely just agree that it was genuinely ambiguous. And then the district court did not engage in the text structure history purpose of the, of the guideline when it determined that it was genuinely ambiguous. And I think that you see the ramifications of that because the government and I disagree about perhaps where the zone of ambiguity really is. We argue that there's a comparison between standard and maximum or large capacity. And the government argues that there must be a number. So I think there are, with the record, some difficulties in that we are disagreeing about the zone of ambiguity to some extent when we're talking about a reasonable interpretation. When you say we could evaluate it according to standard capacity, what criteria would you be using to evaluate the standard? What's the, is there a geographical constraint to that? Is there a particular market? What's the, how would we go about evaluating what is standard? We propose a firearm by firearm specific test where you would look at the firearm that was possessed here, which is an AR-556 by Mr. McIntosh's co-defendant, Mr. Lloyd. And you would assess, well, what, how is it sold? What does it come with as a standard issue? And I think the evidentiary record is not clear on this. The agent, the government's agent said that he thought it would be 20 or 30 rounds. The parties agreed ultimately that it was more than 15, and they really focused on the commentary. They didn't develop the fact, the government did not develop the factual record here. But looking at what the AR-556 can hold, if 30 is what it comes standard, then having a gun with a 30-round magazine isn't an aggravating factor because that's how it was bought, that was how it was sent, and it's not something that has been modified to accept a larger capacity. And I think the government could, when trying to prove this enhancement, if you agree that the commentary's bright line, more than 15 rule, is unreasonable, could look to the manufacturer, what's available, what aftermarket products are available. There are ways that it could meet its factual burden of demonstrating that a gun is capable of accepting a large capacity magazine. So are you suggesting the Sentencing Commission should not put a number on this? Excuse me? Are you suggesting the Sentencing Commission should not put a number? If the Sentencing Commission wants to put a number on it, then its number needs to be in the text of the guideline, not in the commentary. How is it unreasonable for the Sentencing Commission to put the number on it when it tethered it to the expired assault weapons? Respectfully, I don't think it tethered it to the expired assault weapons ban, and that gets into the history of the ban and the history of the guideline. So in 1987, when the Sentencing Commission enacted Section 2K2.1, there was not an enhanced base offense level scheme for magazine capacity, but really not for firearms at all. It's at a general base offense level. And one point I'd like to make in responding to the government, they say it's always been focused on firearms that can fire many rounds without reloading. Actually, in 1987, in the background commentary to the introduction to the guideline, the Sentencing Commission says expressly, the guideline is not based upon the type of firearm. And it had looked at statistics showing that sentences were about two to three months lower for offenses involving shotguns or rifles, and they surmised perhaps those are more often used for recreational purposes. So it's very clear in 1987 in the background commentary that they're not focused on the type of firearm. And as you see the guideline progress, you see that they're punishing illegal conduct. They're punishing people who have certain convictions, perhaps for possessing a machine gun, or they're offering increased punishment for people who have firearms that are regulated. And to your point that it tracks the ban, the ban was actually much narrower than how the Sentencing Commission ultimately defined. The ban was 10, right? The ban was 10. Well, excuse me, I'm inaccurate there. The ban defined semi-automatic weapon and also large capacity ammunition feeding device. When it defined semi-automatic weapon, it did so with the ability to accept a magazine, but also certain features. If it had a telescoping stock, if it had a bayonet mount, I think if it had a flash suppressor, then when defining large ammunition feeding device, it defined that as 10 rounds or more. So when the Sentencing Commission in 1994 introduced the enhanced base offense levels, they adopted the language of the ban expressly, incorporating the statutory sites at 921, 830, and 31. Then the ban expires. There is some suggestion that Congress had commissioned a study that undermined some of the rationales for the ban. And the Sentencing Commission was left with the decision, well, what are we going to do now in light of the ban's expiration? One option was to remove the enhanced base offense level scheme entirely, and the second was to retain it. They ultimately retained it, importing a definition that had relied on magazine capacity, and that's how magazine capacity came to be in the guideline. How is that unreasonable? Well, it's unreasonable because it did two things. It changed the purpose of the guideline, which had never been focused on the type of firearm involved, and it also expanded the scope of qualifying firearms. So, for example, under the ban, a firearm, for example, like a Glock 17, would not have qualified. It wouldn't have met the standard. But now, under the new magazine capacity only, that firearm does qualify for the enhancement. And so it's in tension with the history of the guideline itself, and also it expands the enhanced base offense level scope to a much larger class of firearms than had previously been covered. And so I do think that's unreasonable. When they offered their opinion for why they were doing that, they just said inconsistent application in light of the ban. You say that it's unreasonable and that it's expanding what's covered, but the text of the guideline has the enhancement for large capacity magazines. Correct, Your Honor. So if there's not some interpretation that at least puts a cap on that, that magazines that are under a certain number are not going to qualify, wouldn't the removal of that cap, which is what I take you're arguing for, be what actually expanded it? I mean, having a cap seems like it actually cabins when the enhancement would apply. And in the absence of that, courts around the country could use, for example, 17, like at least one state does. Right. I think that the commentary in some ways limits the application of the guideline. We are not challenging the in connection with or close proximity to aspects of the guideline as unreasonable, but I think the guideline itself says semi-automatic firearm that is capable of accepting a large capacity magazine. And really what's ambiguous about large capacity magazine, I think on this record, we don't know, the government never proved, what limit the AR 556 could accept or how it could be modified. So I think I understand your point to be raising the government's point that this is going to apply regardless under either scenario. And I don't think that on this record factually we have that conclusion, because there was a stipulation amongst the parties that this gun could accept more than 15, but there was no discussion about how much more or whether it would accept, for example, a 60-round drum. That wasn't at issue, though. It wasn't at issue because the parties were focused on the reasonableness of the commentary and disregarding the commentary. The district court did, I think, on at least two occasions, ask if an evidentiary hearing was necessary, and I think that the government suggested, well, we could call our agent and prove this up, and then was willing to accept the over 15 round. But I think if you were worried about in this case, I don't think that the application could apply. I don't think that the enhancement could apply without a further factual record, and I don't think that that would be an appropriate thing to do on remand. And just one other point, even if the panel is inclined to say that this might be reasonable, I think the history of the assault weapons ban and the history of the guideline undercut the conclusion that the commission's commentary would be entitled to deference. So we're challenging it because it's not within the government, excuse me, it's not within the sentencing commission's substantive expertise or a reflection of its fair and considered judgment, and I think when they adopted the large capacity magazine enhancement, they said inconsistent application of the ban. There was no recognition that it was expanding the class of firearms it was going to apply to. There was no discussion of statistics. I mean, the history of this amendment suggests that the sentencing commission had looked at statistics and had noticed that in 1987 there were higher sentences for rifles and shotguns, and in 1994, 50 to 70 percent of cases involved a semi-automatic weapon. Ms. Basile, it sounds like your argument is actually going to the text of the guidelines, that you think it's unreasonable for the sentencing commission to have put in there anything about capacity and to accept a large, capable of accepting a large capacity magazine. But that's in the text. You're not taking issue with that, are you? No, I think I'm taking issue. The text is clear that it does not apply to all semi-automatic firearms. It applies to a narrower class that is able to accept a large capacity magazine. So the question for us, how one goes about understanding that term, and we have, let's assume for these purposes that it's ambiguous, and we're then looking at commentary that has given a numerical cap to that term. Again, why is that? If we accept it's already in the text that there is this large capacity magazine takes this into a particular category where it would qualify for enhancement, how is putting a cap of 10 or 15, as the case may be, how does that expand the application rather than cabinet in a reasonable way? Well, I think factually capping it at 15 is too low of a number given industry standards and given the reality that most semi-automatic firearms are capable of accepting a magazine with 15 or more rounds. So that exception has swallowed the rule and made the enhanced base offense levels applicability broader than the guideline text envisioned. I mean, I understood something you may have said a minute ago. Why is this phrase read as a quantity restriction and not a quality type? And this goes back to my point of saying, have we really delved in or did the district court sufficiently delve into what this phrase capable of accepting a large capacity magazine means? For instance, you referenced a drum. A drum is a different type of ammunition feeding device in kind than it is in size. And so it's possible that if that's what this means, well, that doesn't apply to the kinds of magazines that are at issue here at all. But I don't know that we know any of that because, one, the district court didn't have the occasion to go through the process of figuring that out. But two, the commission hasn't done that. The commission in the commentary hasn't explained its thinking, and it certainly hasn't done so in the text of the guideline itself. So we're left sort of trying to deconstruct these words, and we're zeroing in on capacity meaning quantity when it's possible, when you look at the cross-reference, for instance, to 5845, that we're talking about are types of firearms. It's contrasted to the other for the enhancement applies to if you have a semi-automatic weapon capable of accepting a large-capacity magazine or if you have one of these other kinds of firearms. And those other firearms are the ones that are highly regulated under federal law, machine guns, sawed-off shotguns, things like that. It's possible that if we were to really use all the interpretive tools that Kaiser, again, directs us to do, we would understand that this has nothing to do with quantity at all, which then gets to your point, I think, about saying, well, how is 15 with nothing more, more than 15, a reasonable answer to all of that interpretation? A lot of comments, Eric. And I see that my time is up. If the panel has no further questions right now, I will be back on rebuttal. You can be on our time. Thank you. I'd just like to understand what the alternative is that you would put in front of us, because when we have the term large-capacity magazine, it's been interpreted by the commission to have 15 as a cutoff. There are 14 states and District of Columbia that have other numbers that they're using, most of them at 10, most of them even less than what's in the commentary. You'd have us not use the commentary or a numerical limit. What does that do to the administrability of this guideline and this enhancement and for uniformity and consistency in sentencing around the country? I think that it's not as dire as invalidating the more than 15-round commentary would result in district courts not being able to make this determination. I think it would be a factual inquiry that would be left to the government to prove by a preponderance of the evidence and for the district court to find that the gun possessed in a particular case qualified as a large-capacity magazine. That would be a subjective decision every district court would have to make as to whether or not it's a large-capacity. It would be a fact-based, specific determination, yes. So Judge A could come to the number of 10, Judge B could come to the number of 12, Judge C could come to the number of 15, and it's all good? I would not recommend. I mean, I think that there is a problem with using a numerical limit in a vacuum, and I think that that is the problem that happened with what the Sentencing Commission has done here in the commentary. I don't think it's – I don't – there is no good reason why 15 doesn't count but more than 15 does and why it's more than 15 but not 10 or 17 or 30 or 50. So I think the district court, what we are advocating for, is a comparison approach between what the firearm that was possessed is, its make and model, how it is standard-issued, and how that firearm, as it came into that sentencing, compares to other firearms. So when you say standard-issued, do you mean standard-issued and that a lot of these weapons have different – have the ability to accept different size magazines? How does that help? I think it speaks to culpable – or I'm sorry, proportional punishment, which is if you have – if a firearm can routinely accept a 30-round magazine and that's the basis of an enhancement, that's not really getting at aggravated conduct for the individual being sentenced. And so looking at the standard versus ways it could be modified or what its use was, and I think that that's in the history of 1987 when the guideline was amended. It said the use of the firearm is a relevant factor if you're using it for recreational purposes or if it's – so I think that I don't think that relying on a number is sufficient to say that this is large. And I do recognize that it would require more factual finding by the district courts, but district courts are well-suited to engage in that type of factual finding. Ms. Healy, we've taken a lot of time on this issue, and I know you have a second issue that you've devoted at least as much time to in your brief. Would you like to take a few minutes and talk about in connection with another felony offense? Yes, thank you, Your Honor. So this offense, we are arguing that the phrase another felony offense is not genuinely ambiguous, that it requires a distinction in time or conduct. There is a lot that has been written in this circuit with Fenton initially having that rule. Then Fenton was sort of revised in, I believe, Lloyd and Navarro, and then ultimately overturned in Keller in light of an amendment to the guidelines commentary. And so our first position is that Fenton really got this right when it said that another felony offense is not susceptible to two meanings. You know, another requires something different or distinct from the first one considered. An offense means an infraction of law, so it's possible that an offense could encompass multiple infractions of law in the same felonious conduct or in the same criminal act. How can we say that it's not genuinely ambiguous when before the amendment we had a circuit split with a number of circuits saying the plain text requires a difference in time and conduct and other circuits saying the plain text requires the opposite? We're just looking at elements. And even within our own court, you know, two of our respected colleagues concluded that difference of, you know, time and conduct, but the third had a different view. Isn't that, I mean, in Keller, we also, while ultimately giving deference to the commentary, but the reasoning that we expressed was that the plain text was ambiguous. How, with that background, can we really say that there's no ambiguity on the face of the guideline? So I think that the circuit split is not dispositive that there is genuine ambiguity. I think, first, the circuit split developed on a couple of issues. Some of the opinions were focused really on what the phrase another felony offense meant. Others that were considering the issue focused on the possible risks of double counting. And then others were focused more on the in connection with prong of the language and the Smith line of cases about what that required. So there was diversity of opinion, but it wasn't all about, it was covering a lot of different topics. And I think that, you know, Keller does suggest that the phrase is ambiguous, but it says it's only ambiguous in a context-specific way when the other offense is closely related to the burglary or the firearms possession. So I don't think that the circuit split, as it developed, necessarily means that another felony offense is genuinely ambiguous. And Judge Roth's dissent in Fenton was focused on the concern of double counting. So I think that here, when you're looking at the conduct at issue, he's possessing the firearm as part of the burglary. And he's not using it or doing anything to facilitate the burglary. It's just the possession that is applying this enhancement. Let me just challenge you on that, because per the indictment, it appears that the possession charge relates to June 1st, 2020, that the burglary, the theft offense, was the day before. So even if there were a requirement of a difference in time and conduct, given that the possession charge is for the next day when he's apprehended and dispensed with the firearm, why don't we have here that very difference? Do we even need to resolve the question here about the reasonableness of the guideline? So I think in that case, actually, under that understanding, the possession would be last in time. And there would not have been another felony offense that he's possessing it with after he's apprehended, tossing the gun. So I think that is not the Fenton case exactly. Exactly, that is now someone who has burglared a store on the night before and then is apprehended and possesses the gun and did nothing else with it other than, I think, throw it into the trash can. So there wouldn't be another felony offense to rely on under that reading of another felony offense. But burglary as one offense on a given date with the element of entry into a building is different and involves different conduct than the offense of possession by a felon, right? Yes, but it says if the defendant used or possessed any firearm in connection with another felony offense. So if you're not looking at his possession during the burglary and you're looking at the possession at the time that he's been apprehended, at that point he's just walking on the street and being arrested. There isn't another felony offense that has happened at that point. He's a prohibited person, right? He's a prohibited person carrying a firearm. So that's another offense. That is the firearms possession offense. And I think it's possible to read offense. Again, when Fenton cataloged, there were three separate offenses in Fenton. It was two pharmacy burglaries and then ultimately a sporting goods store burglary. And those three offenses gave rise to five different charges. So the Fenton panel considered that an offense could encompass more charges or more convictions but still include one criminal act or the same felonious conduct. All right. I'll give you a rebuttal. Thank you. Thank you, Your Honors. Mr. Wenger, would you please add an additional five minutes to Mr. Wenger's time? Thank you. Good morning, Your Honors. And may it please the Court, Jesse Wenger on behalf of the United States. The district court here properly applied both enhanced base offense level at issue and the enhancement at issue. Starting with Judge Mady's questions on ambiguity, which got a little bit of a short drift in the briefing because all the parties and the district court found the term to be ambiguous below. The term large, as it's been used in the history and context of this guideline and in the assault weapons ban has always contemplated a quantity. Starting with the assault weapons ban, you have previous 921A31, which talked about a large capacity ammunition feeding device. And Congress did not leave that to anyone to guess what large capacity ammunition feeding device is. It had to set more than ten rounds, qualifies as a large capacity ammunition feeding device. And as the text of the guideline progressed, you see that concept being imported into 2K2.1. And you see large always being referenced in relation to a particular number. And that's also how you see it being used in all the states and localities that have reason to define the phrase. They use the phrase large capacity and then they always take the next step to provide a number. Except the sentencing commission didn't do that, right? So it's not always because the one entity that could have resolved this didn't do it. That's why we're here, right? They did not in the substantive text of the guideline, Your Honor, but they did in the commentary. And looking at the text history and purpose of the term large capacity magazine suggests that, for one, the purpose of the enhancement is not to target nonstandard magazines. Taking that to its logical conclusion would suggest that if Colt decided to issue a 50-round magazine with a standard issue with an AR-15, then a defendant who purchased that firearm, standard issue, would not be subject to this enhancement. But if Glock issued a semi-automatic firearm with a standard issue magazine of 10, and then a defendant got an aftermarket magazine of 11. Why is that a problem, though? I mean, that's a fact-finding issue relative to the conducted issue. That happens in guidelines cases all the time. These are legal standard that applies uniformly, and then it varies the facts and circumstances, varied application. Why is that a problem? Because it would gut the history and purpose of the enhancement at issue. The purpose has never been geared to nonstandard. It would violate the text, though. I mean, again, we can't jump right to history and purpose. You have to get past the text first. You're saying, well, that just wouldn't make any sense. Well, it would make sense under the text. Perspectively, I don't think it does make sense under the text because large capacity, starting with the assault weapons ban, has been used in reference to a number. If you're taking out – the text is the first step and frequently the most important step, but it's not the only step. And as multiple panels of this court have described, the ambiguity determination, while now needs to be more rigorous post-Kaiser and Nassir, it's not an insurmountable burden. And the traditional toolkit available to your honors can still lead to an ambiguity finding. And here, at the very least, the term large capacity magazine is subject to multiple meanings. And if it's not, I would submit it has to reference quantity. Otherwise, in the framework of the guidelines, you're going to have defendants being treated wildly different, and sometimes defendants who are more culpable being subject to less onerous guidelines or injuries when defendants were less culpable. There is a commission that has been capably assembled by the Congress of the United States to address those kinds of disparities. But what the government asks us to do is to say, well, because things have shifted since the 80s to 2006 to 2024, and the commission hasn't, well, we need to figure all of this out, and therefore it has to be a number. And I do hear your argument. It has to be a number, because what else? This will be unworkable otherwise. Well, it's also workable if the sentencing commission revises what it wants us to do. Because in 2006 when this was set, the idea that large meant 15 is tough to square since 44 states had no restrictions on magazine capacity at all. So the minority position that is now being advocated as the standard in 2006 doesn't seem to sit comfortably with what the text of the regulation is. I do understand that maybe times have changed and the commission should update its thinking, but we have to look at what the text says, right, at the time it was promulgated. I don't believe the minority – it's the majority position of those localities that have reason to regulate the term. And the fact that – Not in 2006 it's not. That's what we're looking at is in 2006. The majority of jurisdictions in the United States did not criminalize large capacity magazines. Right. But the commission is not setting criminal law. Discussing which factors involved in a criminal offense should result in enhanced punishment. It's a wholly distinct universe than legislatures saying this is a crime. For example, in the other enhancement issue in this – I agree with that. I just don't know why you're then pointing to those localities. I mean, in your briefing you argue that those fixations are relevant, but now you're saying I think they're not. In my briefing I point to those localities at the reasonableness prong, not the ambiguity prong. Okay. So in the ambiguity prong, just following your honors questioning, suggesting that large could be a – more akin to standard and not quantity. Falling back again to the entirety of the plain text of the guideline, we have semi-automatic firearm capable of accepting a large capacity magazine. It's never been disputed between the parties below or in appeal that virtually every single semi-automatic firearm in existence is capable of accepting an aftermarket magazine that – right. The imaginary is the end there, however many rounds you can fit in the magazine. So under a purely textual reading, if one was to find it unambiguous, it would apply to every single semi-automatic magazine. Right. It would apply to every semi-automatic weapon, which would then read out the large capable of accepting large capacity free. Yes, Your Honor. Right. So that has to mean something else, and that's what we're debating. Correct, Your Honor. So the text, structure, history, and purpose of the guideline in the government's view result in the phrase large capacity magazine being ambiguous and in need of interpretation as supplied by the guidelines. I'm trying to tie that to a number. Why isn't the history that you just recounted – why doesn't that just point out that this really is not interpretive, but legislative, a policy choice? And, in fact, it's legislatures from Congress to different states that have been selecting the number. We don't have it here. We don't have it as Judge Meade is noting. It's not in the text where it would necessarily have gone through notice and comment. So why don't we have here what appears to be a legislative or policy decision being made by the commission? Because courts have suggested that use of a number does not turn something into a legislative policy choice. That doesn't take it outside the bounds of an interpretive rule. And it is more likely to be an interpretive rule when that number is being used to interpret numeric language. And the government's position is large in this context, is numeric language that requires an interpretive rule with a number, much like in Warshaw v. Solis when the regulation at issue was what constituted insubstantial value in terms of whether something constituted a bribe or gratuity. And there, not the Third Circuit, but the Court of Appeals held that it was an interpretive rule to say that a $250 threshold interpreted insubstantial value. And there wasn't much reasoning. It just took the position that this is a numeric language calling for a numeric threshold. And $250 to set that threshold was an interpretation of the phrase. That is wholly distinct from what we see in Hocter and Riccardi, the two cases primarily discussed in the briefing. In Hocter, their regulation at issue is what securely contains animals, secure containment. There's nothing numeric in that language, so it trended towards a policy choice to create an 8-foot fence requirement based on that language. Similarly, in Riccardi, loss, while this court has found it to be unambiguous and the Riccardi court didn't have reason to reach that issue, but it said no matter the ambiguity, if it even is ambiguous, it's not ambiguous in a numeric component. No one would say, oh, loss is ambiguous, so I'm going to say a $5 gift card means $500. So, right, no matter what, it's not reasonable even if it is ambiguous. Here we have numeric language in terms of large. What differentiates a large soda at 7-Eleven from a small soda is the number of ounces in the cup. Let's say we reach the issue of controlling weight. What do we do with the sentencing commission having made the change from 10 to 15 without meaningful explanation, having effectively dispensed, it used to be with the 10, a policy statement that also gave a lot of flexibility to district courts in sentencing to determine how the enhancement would apply, that flexibility seems to be taken away. If we've got this kind of shifting position on the part of the commission over time, if we get to the, if we say yes, reasonable, but we still have to consider whether it's entitled to controlling weight, why should we conclude that it is entitled to that when it's changed over time? Sure, Your Honor. So what Kaiser requires is that the interpretation that the commentary here must in some way implicate the relative agency's, here the commission's, substantive expertise. It needs to fall within the agency's ordinary duties. That's the mandate of Kaiser. And as panel after panel, this court has come to the conclusion every time it had reason to reach step three of the analysis, it came to the common sense conclusion that matters of criminal sentencing and what factors aggravate or mitigate an advisory guidelines range fits squarely within the sentencing commission's bailiwick. That is what they do, and it fits within their substantive expertise. For example, in United States v. Caraballo, this court had reason to find the term serious bodily injury ambiguous. And it went through the purposes of the sentencing commission in deciding that the commission's commentary was afforded controlling weight under the three-step Kaiser process. So because this relates to criminal sentencing, it necessarily implicates the institutional expertise of the sentencing commission? That's what multiple panels of this court have suggested, Your Honor. And because you defined the phrase to be one that must implicate a number, then any number that the commission picks and puts into the commentary without any explanation is going to be reasonable and sufficient under Kaiser because it somehow relates to criminal sentence. So if tomorrow they want to make it 14 or 16 or just 15, not 15 or more, all of that's reasonable and they don't need to explain any of it because it's a quantity and it implicates a criminal sentence. Each time we have to go through the three-step process. Hard to see how it would come in any different though, right? Depends on the number, Your Honor. I would submit that if the commentary were 14 or 16, it would not come in any different. But there's not any number you could throw in there that would fit step two's reasonableness requirement. What number wouldn't? What is the zone of ambiguity, right? You're in crazy hypotheticals. Would two be reasonable to constitute a large capacity magazine? No. Would a limit of 150 be reasonable? No. Reasonable minds could differ about where the outer bounds of this zone of ambiguity is. I submit for purposes of this case, whatever that outer bounds on either end is, more than 15 fits squarely within it and answers that zone of ambiguity left by the guideline. Do you want to address the in connection with issue as well? Yes, Your Honor. So this court has spoken to this exact language two times, United States v. Fenton and United States v. Keller. Starting with step one of the process, whether the phrase itself is ambiguous, United States v. Keller said the plain language of the guideline is ambiguous. Now, I don't believe post-Kaiser and Nassir that necessarily binds this court, given the shifting landscape. But it's certainly a more faithful interpretation of the plain language of the text than occurred in Fenton, which relied heavily on then application note 18 to come to its interpretation of the guideline. And as I pointed out in my briefing, and I believe as Your Honor had a question on, the existence of both inter- and intra-circuit differences of opinion give rise to that reasonable minds could disagree as to the appropriate meaning of another felony offense. And as this court has acknowledged in either Mercado or Caraballo, when reasonable minds can differ as to the appropriate meaning of an offense, that lends support to finding that phrase ambiguous. Let's say we get past ambiguity, we're looking at reasonableness, or as part of the plain language interpretation we bring to bear, in one or the other context, the rule of lenity. Wouldn't that undermine your argument? If we were to look at lenity in the plain language context, we would need to interpret it in connection with another felony offense in a way that did treat it as something separate and distinct, right? I believe United States v. Chandler squarely forecloses turning to the rule of lenity unless and until you have resorted to everything that is available to Your Honors, including the commentary. And so focusing on the rule of lenity argument here, after resorting to the commentary, there's just simply no ambiguity left. I appreciate that, but we have a petition for a hearing pending in Chandler. Does your argument turn on whether Chandler stands or not? The rule of lenity argument?  Here there is no ambiguity about whether another felony offense could apply when you're committing multiple felony offenses even in close proximity to each other. Circling back to Judge Krause's earlier question, do we need to answer that question in this case? I believe you do, Your Honors, because to the extent there was going to be another felony offense enhancement premised on the day after when the gun was recovered, I don't think there's any factual findings or record at all to suggest what that other felony offense was and whether the gun was possessed in connection with it. Could it be? Perhaps. It's not something that we argued in our briefing, and I don't believe the factual record as it exists would necessarily support only one reasonable conclusion in terms of whether you could get that enhancement based only on the recovery of the firearm the day after the burglary. But I think the facts here squarely present a scenario where you have a burglary. Once this individual, once Mr. McIntosh broke into the gun store with an intent to commit a felony therein, he committed burglary. He was a person prohibited at the time. As soon as he possessed a weapon, he was a committed 922-G. He was a person who was prohibited from possessing a firearm. When he possessed that weapon, it had the potential to facilitate that burglary. If someone came in to apprehend him, if someone tried to catch him when he was fleeing, he now had firearms that he could use to aid himself. So the facts of this case fit squarely with an enhancement for use of a firearm in connection with another felony offense. How would the continued possession of one of the stolen firearms and then disposing of that firearm the next day not be in connection with the theft of the firearms? I'm not saying it couldn't be. I just don't believe that the factual record and those arguments were presented to the district court for the district court to have made factual findings to support the enhancement on that basis. I think if that were the only path your honors foresaw going down, your honors would benefit from a factual record suggesting what happened. Given the charges in the indictment, why does there need to be, beyond the conviction, why does there need to be additional fact-finding? If your honors feel comfortable finding that the day after his possession of that firearm still was in connection with the prior day's burglary and that he was attempting to cover it up when he was throwing it to the trash can or throwing it to the side and that act sufficiently tied it based on your honors' review of the record, then your honors could find that the enhancement applied on that basis. The way it was argued and presented below was premised on the factual scenario where this individual focused on the day of the burglary itself, that he broke into the sports store with his co-conspirator, his co-defendant, that they stole firearms and their possession of their firearms that day and in the immediate aftermath of that burglary was possessing a firearm in connection with another felony offense. Thank you, your honors. Thank you.  Thank you very much. I'd like to make three points on the another felony offense enhancement and then if I have time, one quick point on the large capacity magazine. First, to Judge Krause's question about Chandler and the rule of lenity, I do think that if this court en banc grants rehearing in Chandler, then it could control the outcome of this case. The petition for rehearing does argue that lenity should displace the guidelines commentary and so here if we have two reasonable readings or two potential readings of a genuinely ambiguous phrase, then the rule of lenity, if this court takes Chandler en banc, would operate to tame the harsher reading to Mr. McIntosh's benefit. And if this panel determines that the phrase another felony offense is genuinely ambiguous, I still think that the commentary applying a per se rule for burglary is not reasonable. And there wasn't on this fact pattern a potential for this firearm to facilitate the burglary. The burglary occurred in the middle of the night. There's no allegation that anyone was present other than Mr. McIntosh and his co-defendants, so there's no brandishing or use or facilitation here and a blanket rule that a firearm always has the potential to facilitate in burglary cases is unreasonable. I think if you look to this court's decision in Perez, it's not the exact same context, but they made a rebuttable presumption there when the other offense was a drug trafficking offense. And at the very least, I think there should be some ability for Mr. McIntosh to say this is not, this possession did not facilitate the crime, did not facilitate the burglary, and always applying it as a per se rule is not a reasonable interpretation of the phrase. The language is not just facilitate, right? It's potential to facilitate. Isn't there the potential to facilitate another offense when the firearm is I think the reality of someone holding a firearm is it probably likely always has the potential. It could maybe always satisfy that. And in Smith, the Supreme Court made clear that mere possession is not sufficient for facilitation. And so saying that a firearm in a burglary always has the potential conflicts with the Supreme Court's decision in Smith and does say that mere possession will always allow the ability to facilitate. And then third, I think Mr. Wenger talked about possibly the fact pattern where Mr. McIntosh disposed of a firearm as he was being apprehended, and perhaps that could still sustain another felony offense enhancement. I agree with him that that was not fully explored in the district court below. Nonetheless, I do think that there is precedent from the circuit that would make clear that that enhancement does not apply. I unfortunately didn't cite it in my briefs. It's United States versus Hester. And in that case, the individual had possessed a firearm, and there was some jailhouse recording that suggested the purpose of his possession was to get rid of it for his cousin. And he had been charged with evidence tampering. I'm sorry, not this panel. But this court made a factual finding that the government had not met its burden under a preponderance that evidence tampering had been found. And then it also said even if you had proved evidence tampering by a preponderance of the evidence, nonetheless, we would not apply it here because the individual did not use or possess that firearm in connection with. I didn't articulate that perfectly, but I do think Hester forecloses its application based on the theory that Mr. McIntosh disposed of the firearm. I see that my time is up. Thank you very much. Thank you both counselors. Again, had an excellent argument. We very much appreciate as we work through these interesting issues.